360 F.3d 1090
 Richard WRIGHT; Greg S. Buchanan; and Darell Hagan, Plaintiffs-Appellants,
v.
OREGON METALLURGICAL CORPORATION, dba Oremet Titanium; Carlos Aguirre; Dennis Opinion P. Kelly; Gary Weber; Jack Cox; Key Trust Company of the Northwest; and United Steel Workers of America Local 7150, Defendants-Appellees.
 No. 02-35853.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted January 7, 2004 — Seattle, Washington.
 Filed March 11, 2004.
 
 COPYRIGHT MATERIAL OMITTED Gary D. Greenwald (argued), Columbus, Ohio; Anne Marie La Bue, Columbus, Ohio; James C. Egan, Albany, Oregon, for the plaintiffs-appellants.
 Douglas L. Greenfield, Washington, D.C.; Leon Dayan, Washington, D.C. (argued), for defendant-appellee United Steelworkers of America Local 7150.
 Brian T. Ortelere, Philadelphia, Pennsylvania (argued); Amy Promislo, Philadelphia, Pennsylvania, for defendants-appellees Oregon Metallurgical Corp., Carlos E. Aguirre, Dennis P. Kelly, Gary Weber, and Jack Cox.
 Brian J. Lamb, Cleveland, Ohio; Gary L. Walters, Cleveland, Ohio, for defendant-appellee Key Trust Company of the Northwest.
 Appeal from the United States District Court for the District of Oregon; Anna J. Brown, District Judge, Presiding. D.C. No. CV-01-00325-BR.
 Before: Susan P. GRABER, Richard C. TALLMAN, and Richard R. CLIFTON, Circuit Judges.
 Opinion by Judge Clifton.
 OPINION
 CLIFTON, Circuit Judge:
 
 
 1
 The Oregon Metallurgical Corporation ("Oremet") in the late 1980s established a stock bonus pension plan for its employees (the "Plan"). The Plan's terms mandated that a defined minimum percentage of each Plan participant's portfolio had to be invested in Oremet stock. Following Oremet's merger with another company, Oremet employees Richard Wright, Greg Buchanan, and Darell Hagan ("Plaintiffs") and other Plan participants requested that Oremet, the Oremet plan fiduciary, and former Oremet officers and pension plan administrators ("Oremet Defendants") investigate investment alternatives and amend the Plan to permit its participants to sell a higher percentage of employer securities than the percentage permitted by the Plan's express terms in order to capture the "premium" generated by the merger. The Oremet Defendants rejected the Plan participants' demands.
 
 
 2
 Plaintiffs subsequently brought suit under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1144 against the Oremet Defendants, Key Trust Company of the Northwest (the Plan's trustee) ("Key"), and United Steel Workers of America Local 7150 (the "Union") (collectively "Defendants"), for breach of ERISA's prudence, exclusive purpose, and prohibited-transaction provisions. The district court dismissed their claims with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6), and Plaintiffs appealed.
 
 
 3
 Plaintiffs fail to state any legally cognizable claims under ERISA. Based upon the facts alleged, the Oremet Defendants' decision to comply with the lawful terms of the Plan following the merger was entirely consistent with ERISA's fiduciary requirements. Because the Union and Key are neither fiduciaries nor de facto fiduciaries, they likewise cannot be found liable under ERISA. We therefore affirm the district court's dismissal of Plaintiffs' claims.
 
 I. BACKGROUND
 A. Statutory Framework
 
 4
 ERISA is designed to "protect ... the interests of participants in employee benefit plans and their beneficiaries ... by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans." 29 U.S.C. § 1001(b). To this end, Congress has mandated that private pension plan assets are to be held in trust for the exclusive benefit of plan participants and beneficiaries. Id. § 1103(a); § 1102(a)(1). Moreover, the authority to administer the plan must be vested in one or more named fiduciaries. Id. § 1102(a)(1). The fiduciary need not be an independent party; the employer or plan sponsor may appoint its own "officer, employee, agent, or other representative" to serve in a fiduciary capacity. Id. § 1108(c)(3).
 
 
 5
 Section 1104(a)(1) of ERISA imposes three general duties on pension plan fiduciaries. ERISA fiduciaries must 1) discharge their duties with "prudence"; 2) diversify investments to "minimize the risk of large losses"; and 3) act "solely in the interest of the participants" and for the "exclusive purpose" of providing benefits to those participants. Id. § 1104(a)(1). ERISA also expressly prohibits certain transactions where the potential for abuse is particularly acute. Section 1106 of ERISA forbids a fiduciary from engaging in a transaction that the fiduciary "knows or should know" is a transaction with a party in interest. Id. § 1106(a). Furthermore, employer securities ordinarily may not comprise more than ten percent of the aggregate fair market value of plan assets. Id. § 1107(a)(3)(A). Finally, ERISA requires that fiduciaries discharge their duties in accordance with the terms of the plan, except when such terms conflict with Titles I or IV of ERISA. Id.
 
 
 6
 Eligible individual account plans (EIAPs) — i.e., profit sharing, stock bonus, thrift or savings plans, employee stock ownership plans (ESOPs) or pre-ERISA money purchase pension plans[1] — are exempt from several key ERISA provisions. EIAPs are exempt from ERISA's diversification requirement and its prudence requirement to the extent that it requires diversification. Id. § 1104(a)(2). Similarly, EIAPs are exempt from the percentage limitation on investments in employer securities. Id. § 1107(b)(1). Finally, only EIAPs may borrow funds from the plan sponsor. Id. § 1108(b)(3). But for these exceptions, EIAPs, due to their very nature, would run afoul of ERISA. See Fink v. Nat'l Sav. & Trust Co., 772 F.2d 951, 955 (D.C.Cir.1985) (noting that "[a]cquisition of employer securities by an EIAP does not, in and of itself, violate any of the absolute prohibitions of ERISA").
 
 B. Factual Summary
 
 7
 As this case is appealed from the district court's granting of a Rule 12(b)(6) motion, the following alleged facts are taken primarily from Plaintiffs' First Amended Complaint and its attachments.
 
 
 8
 Oremet established the Plan in November of 1987. The Plan Agreement and the Trust Agreement set forth the terms of the Plan as amended and restated in 1989. The Plan Agreement provided that the Plan was a "stock bonus plan" and an "employee stock ownership plan" "invested primarily in shares of Oremet stock." The Plan Agreement also established a trust. The trust assets initially consisted of 6,267,281 shares of Oremet common stock valued at approximately $17 million. The Plan financed its purchase of these shares with a loan from Oremet. The loan was repaid in full in 1994, and all shares of Oremet stock held by the Plan were allocated to the Plan participants' accounts.
 
 
 9
 A two-person Administrative Committee (the "Plan Administrators"), consisting of one hourly union employee of Oremet and one salaried management employee of Oremet, was designated to manage the Plan. Oremet's Board of Directors was responsible for appointing a Plan Trustee and both Plan Administrators. Defendants Gary Weber and Jack Cox were the Plan Administrators at all relevant times. Defendant Carlos Aguirre was a director, officer, and shareholder of Oremet. Defendant Dennis P. Kelly was Oremet's Chief Financial Officer from 1993 to 1998. Defendant Union represented approximately one-half of Oremet's employees and Plan participants for the purpose of collective bargaining with Oremet.
 
 
 10
 The Plan originally allowed participants to sell up to 40% of the Oremet shares in their individual stock accounts each year so long as the participant remained employed by Oremet (the "Participant Diversification Provision"). Employees who ceased to be employed by Oremet were not subject to the Participant Diversification Provision and could withdraw 100% of the shares of Oremet stock allocated to their respective stock accounts. In 1993 and 1994, as a six-year collective-bargaining agreement was set to expire, Oremet and the Union conducted negotiations on the terms and conditions of a new six-year agreement to be effective from August 1, 1994, to July 31, 2000. The 1994-2000 agreement was executed in the spring of 1994.
 
 
 11
 Oremet stock at all relevant times was traded over the counter on the NASDAQ exchange. The stock's price fluctuated widely between 1987 and 1997 from a low of $3.624 per share to a high of $33.875. During 1995 and 1996, the trading price of Oremet stock steadily rose. Plan participants consequently expressed a desire for greater diversification rights under the Participant Diversification Provision, which would have allowed them to sell their Oremet stock and invest the proceeds in other assets (while maintaining their individual accounts within the Plan). Oremet management became concerned that increasing numbers of Oremet employees would be motivated to terminate their employment in order to withdraw and to sell their Oremet stock. Acting in response to these concerns and under pressure from Plan participants, Oremet amended the Plan in May 1996 ("May 1996 Amendments") to permit Plan participants to sell increasing amounts of their Oremet stock: first up to 55%; then up to 70%; and finally, after July 30, 1996, up to 85%.
 
 
 12
 In addition, the May 1996 Amendments provided that the Plan would cease to be an ESOP but would remain a stock bonus plan at such time as the majority of Plan assets were no longer invested primarily in Oremet Common Stock (the "Transformation Date"). Moreover, the May 1996 Amendments stated that the Plan's requirement that Plan assets be invested primarily in Oremet stock would be replaced with a requirement that Plan assets "be invested as provided in the Trust Agreement." The Trust Agreement, in turn, provided that "up to 100% of the assets of the Trust Fund may be invested in Company Stock," and any stock of an affiliate of Oremet counted as "Company Stock."
 
 
 13
 The Union opposed any further diversification of Plan assets although it agreed to the May 1996 Amendments. For this reason, the May 1996 Amendments included a "Side Agreement" between Oremet and the Union that prohibited subsequent amendment of the Plan "to permit further diversification of the Plan's investments through the sale of Oremet stock until at least the year 2000." Plaintiffs allege that the Side Agreement was motivated by the Union's desire to maintain its current level of representation on Oremet's Board of Directors pursuant to Oremet's by-laws. In 1994, Oremet amended its by-laws to provide that the Plan would nominate and elect four of the nine members of the Board as long as the Plan owned 25% or more of the outstanding shares of Oremet common stock. If the Plan's ownership fell below 25%, the Plan would be able to nominate and to elect only two members of the Board, one union and one nonunion.
 
 
 14
 In October 1997, Allegheny Teledyne and Oremet publicly announced a stock-for-stock merger whereby Oremet shareholders would receive 1.296 shares of Allegheny Teledyne stock for each share of Oremet stock. Oremet stock closed at $23.4375 per share on October 31, 1997, and at $33.875 on November 3, 1997, the first day of trading after the merger was announced. In January 1998, two months before the merger was consummated, a group of Plan participants submitted a petition to the 12-member Plan Advisory Committee asking for the immediate release of the remaining 15% of Oremet Common Stock in their Plan accounts "so as to capture the stock appreciation." The Plan Advisory Committee met in February of 1998 to discuss the petition and other matters. According to the minutes of one of their meetings, Defendant Weber told the Advisory Committee that the Plan "was a bargained for item in the labor contract" and that the Advisory Committee "did not have the authority to act on this petition without concurrence from management and the union." The meeting's minutes further state that "[t]he current agreement is that the last 15% of a participant's account would remain in the trust until at least the year 2000, the next scheduled labor agreement negotiations." Plaintiffs contend that "the current agreement" refers to the 1996 Side Agreement. The request contained in the petition was turned down; the Plan was not amended.
 
 
 15
 In March 1998, the merger of Oremet and Allegheny Teledyne was consummated, resulting in the formation of Allegheny Technologies. As a result of the merger, Allegheny Teledyne acquired all of Oremet's stock, and Oremet became a wholly owned subsidiary of Allegheny Teledyne. Plaintiffs allege that at this time the "Transformation Date" provision of the May 1996 Amendments was triggered and the Plan ceased to be an ESOP though it remained a stock bonus plan. In the words of the First Amended Complaint, the trading value of the Allegheny Technologies stock "fluctuated dramatically" and "began and continued to decrease substantially" after the merger. In November 1999, Allegheny instituted a reverse stock split whereby each Plan participant received one share of Allegheny Technologies stock for each two shares of Allegheny Teledyne stock held by the participant. The Plan held 389,902 shares of Allegheny Technologies stock after the reverse split. After the merger, the value of one pre-reverse split share of Allegheny Technologies stock decreased from $28.94 to $7.94 per share.
 
 
 16
 On March 8, 2001, Plaintiffs filed their initial complaint against the Oremet Defendants, Key, and the Union. The complaint argued that the Oremet Defendants violated ERISA's prudence, exclusive purpose, and prohibited-transaction provisions by refusing the demands of Plaintiffs and other Plan participants to amend the Plan to permit the participants to sell a higher percentage of employer securities allocated to their Plan accounts than the percentage permitted by the Plan's express terms. Plaintiffs further contended that Key and the Union were liable as co-fiduciaries because they participated in, permitted, or failed to remedy the Oremet Defendants' alleged violation of ERISA's exclusive purpose requirement. After the district court identified a number of factual and legal deficiencies in Plaintiffs' complaint, Plaintiffs filed an amended complaint. The district court subsequently dismissed all of Plaintiffs' claims with prejudice.
 
 II. DISCUSSION
 
 17
 We review de novo dismissals pursuant to Rule 12(b)(6). Ove v. Gwinn, 264 F.3d 817, 821 (9th Cir.2001). When ruling on a motion to dismiss, we accept all material allegations of a complaint and view them in the light most favorable to the plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The court, however, is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1295-96 (9th Cir.1998).
 
 A. ERISA's Prudence Requirement
 
 18
 ERISA requires that a "fiduciary shall discharge his duties ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). A court's task in evaluating a fiduciary's compliance with this standard is to inquire "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." Donovan v. Mazzola, 716 F.2d 1226, 1232 (9th Cir.1983). Plaintiffs contend that the Oremet Defendants violated § 1104(a)(1)(B) by failing to investigate whether to sell the Plan's company stock when the company was involved in a merger and a substantial premium could have been realized. They also contend that the Oremet Defendants violated the provision by failing to investigate whether to sell the Plan's company stock when the stock value declined and continued to decline following the merger. Selling the stock in either scenario would have been in violation of the Plan's express terms.
 
 
 19
 EIAPs are exempt from ERISA's diversification requirement and its prudence requirement to the extent that it requires diversification. 29 U.S.C. § 1104(a)(2). EIAPs are also exempt from the percentage limitation on investments in an employer's securities. Id. § 1107(b)(1). Despite these exemptions, courts have emphasized that ERISA's prudence requirement continues to apply to an EIAP's fiduciaries. See, e.g., Fink, 772 F.2d at 955-56. Indeed, the Third Circuit in Moench v. Robertson, 62 F.3d 553 (3d Cir.1995), followed by the Sixth Circuit in Kuper v. Iovenko, 66 F.3d 1447 (6th Cir.1995), has adopted a prudence standard pursuant to § 1104(a)(1)(B) that requires EIAPs to diversify their employer stock holdings in certain circumstances. Under this standard, an EIAP fiduciary who invests in employer stock is presumed to have acted consistently with ERISA; however, a plaintiff may overcome this presumption by showing that the fiduciary abused his or her discretion. Moench, 62 F.3d at 571. To rebut the presumption, "the plaintiff must show that the ERISA fiduciary could not have believed reasonably that continued adherence to the [plan's terms] was in keeping with the settlor's expectations of how a prudent trustee would operate." Id.
 
 
 20
 The Third Circuit's intermediate prudence standard is difficult to reconcile with ERISA's statutory text, which exempts EIAPs from the prudence requirement to the extent that it requires diversification. See In re McKesson HBOC, Inc. ERISA Litig., No. C00-20030RMW, 2002 WL 31431588, at *5 (N.D.Cal. Sep.30, 2002) (unpublished disposition) ("If there is no duty to diversify ESOP plan assets under the statute, it logically follows that there can be no claim for breach of fiduciary duty arising out of a failure to diversify, or in other words, arising out of allowing the plan to become heavily weighted in company stock"). Interpreting ERISA's prudence requirement to subject EIAPs to an albeit tempered duty to diversify arguably threatens to eviscerate congressional intent and the guiding rationale behind EIAPs themselves. See Fink, 772 F.2d at 956 (noting that EIAPs are exempt from certain ERISA provisions because of the "strong policy and preference in favor of investment in employer stock" (internal quotation marks omitted)).[2]
 
 
 21
 That said, the facts of this case do not necessitate that we decide whether the duty to diversify survives the statutory text of § 1104(a)(2). Plaintiffs' prudence claim is unavailing under any existing approach. If EIAPs are unconditionally exempt from ERISA's duty to diversify, Defendants' refusal to diversify the Plan beyond the level of 85% clearly does not constitute an actionable violation of ERISA's prudence requirement. If the Moench standard controls,[3] Plaintiffs' prudence claim still loses. Unlike Moench, this case does not present a situation where a company's financial situation is seriously deteriorating and there is a genuine risk of insider self-dealing. See Moench, 62 F.3d at 572 ("[C]ourts should be cognizant that as the financial state of the company deteriorates, ESOP fiduciaries who double as directors of the corporation often begin to serve two masters."); see also LaLonde v. Textron, Inc., 270 F.Supp.2d 272, 280 (D.R.I.2003) (applying Moench, and reasoning that an "ESOP fiduciary's presumption of reasonableness may be overcome when a precipitous decline in the employer's stock is combined with evidence that the company is on the brink of collapse or undergoing serious mismanagement" (emphasis added)).[4]
 
 
 22
 Though Plaintiffs contend that the district court prematurely dismissed their claims at the motion to dismiss stage, Plaintiffs' alleged facts effectively preclude a claim under Moench, eliminating the need for further discovery. See Weisbuch v. County of L.A., 119 F.3d 778, 783 n. 1 (9th Cir.1997) ("[A] plaintiff may plead herself out of court.... If the pleadings establish facts compelling a decision one way, that is as good as if depositions and other expensively obtained evidence on summary judgment establishes the identical facts.") (citation and internal quotation marks omitted). The published accounts of Oremet's earnings and financial fundamentals during the relevant period, attached to the complaint, demonstrate that Oremet was far from the sort of deteriorating financial circumstances involved in Moench and was, in fact, profitable and paying substantial dividends throughout that period. See Textron, 270 F.Supp.2d at 280 ("It is common knowledge that the stock market suffered dramatic losses during 2000 and 2001, but the Plaintiffs fail to allege any facts that would indicate Textron or the Plan should have had reason to think the decline in the price of Textron stock was anything unusual or specifically related to Textron's viability as a company." (emphasis added)).[5]
 
 
 23
 Mere stock fluctuations, even those that trend downward significantly, are insufficient to establish the requisite imprudence to rebut the Moench presumption. See Kuper, 66 F.3d at 1459-60 (concluding that company's acknowledged failure to even consider diversifying an ESOP during an 18-month period where company's stock declined from more than $50 per share to approximately $10 per share did not constitute a breach of fiduciary duty). As the Sixth Circuit noted in Kuper, a "fiduciary's failure to investigate an investment decision alone is not sufficient to show that the decision was not reasonable.... [A] plaintiff must show a causal link between the failure to investigate and the harm suffered by the plan." Id. at 1459 (second emphasis added). Plaintiffs, with 20-20 hindsight, argue that the Oremet Defendants acted improvidently in declining to sell the stock and capture the merger-related "premium" before the stock price declined. The "premium" Plaintiffs emphasize is nothing more than a rise in share value following a major, though not necessarily unique, corporate development. Stock price benefits accruing from the merger could likewise be generated years into the future. The Moench standard does not compel fiduciaries to permit further diversification of EIAP pension plans upon each subsequent rise in share value attributed to a merger or, for that matter, any other major corporate development. It merely requires fiduciaries to act reasonably. It does not require them to act in an extraordinarily prescient manner.
 
 
 24
 The district court therefore did not err in concluding that Plaintiffs failed to state a claim for a violation of ERISA's prudence requirement.
 
 B. ERISA's Exclusive Purpose Requirement
 
 25
 ERISA's exclusive purpose provision requires that plans be administered "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Plaintiffs argue that the Oremet Defendants violated ERISA's exclusive purpose requirement by deferring to the Union's judgment regarding the propriety of selling Plan assets pursuant to the 1996 Side Agreement and by failing to make a scrupulous independent determination that continued investment in employer securities was prudent or in the best interests of the Plan's participants. Plaintiffs further allege that Key and the Union are liable as co-fiduciaries because they participated in, permitted, or failed to remedy the Oremet Defendants' alleged violation of ERISA's exclusive purpose requirement.
 
 
 26
 Plaintiffs' exclusive purpose claim is derivative of their prudence claim and fails for the reasons outlined above. ERISA requires fiduciaries to comply with a plan as written unless it is inconsistent with ERISA. "ERISA does no more than protect the benefits which are due to an employee under a plan." Bennett v. Conrail Matched Sav. Plan Admin. Comm., 168 F.3d 671, 677 (3d Cir.1999). The duty to act in accordance with the plan document "does not ... require a fiduciary to resolve every issue of interpretation in favor of plan beneficiaries." Collins v. Pension & Ins. Comm. of So. Cal. Rock Prods. & Ready Mixed Concrete Ass'ns, 144 F.3d 1279, 1282 (9th Cir.1998) (per curiam) (citing O'Neil v. Ret. Plan for Salaried Employees of RKO Gen., Inc., 37 F.3d 55, 61 (2d Cir.1994)). ERISA "does not create an exclusive duty to maximize pecuniary benefits." Id. (citing Foltz, 865 F.2d at 373). Because Defendants complied with the Plan's lawful terms and were under no legal obligation to deviate from those terms, they provided Plaintiffs with their benefits due. The district court did not err in concluding that Plaintiffs failed to state a claim for violation of ERISA's exclusive purpose requirement.
 
 C. ERISA's Prohibited-Transaction Provision
 
 27
 ERISA provides that a fiduciary of a plan shall not cause the plan to engage in a transaction if the fiduciary knows or should know that the transaction constitutes a direct or indirect
 
 
 28
 (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
 
 
 29
 (B) lending of money or other extension of credit between the plan and a party in interest;
 
 
 30
 (C) furnishing of goods, services, or facilities between the plan and a party in interest;
 
 
 31
 (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or
 
 
 32
 (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.
 
 
 33
 29 U.S.C. § 1106(a)(1). Similarly, a plan fiduciary shall not "deal with the assets of the plan in his own interest or for his own account." Id. § 1106(b)(1). The Supreme Court has interpreted § 1106 to "prohibit[] fiduciaries from involving the plan and its assets in certain kinds of business deals.... Congress enacted [§ 1106] `to bar categorically a transaction that [is] likely to injure the pension plan.'" Lockheed Corp. v. Spink, 517 U.S. 882, 888, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996) (quoting Comm'r v. Keystone Consol. Indus., Inc., 508 U.S. 152, 160, 113 S.Ct. 2006, 124 L.Ed.2d 71 (1993)).[6]
 
 
 34
 Plaintiffs argue that the Oremet Defendants violated ERISA's prohibited-transaction provision by dealing with the Plan assets for the benefit of a party in interest, specifically, the Union. Plaintiffs contend that the Oremet Defendants' decision not to sell the Allegheny stock through denying a petition by Plan participants falls within § 1106(a)(1)(D) because it constitutes a use of the Plan's assets "by or for the benefit of, a party in interest." The Union, Plaintiffs contend, acted as a de facto fiduciary and violated § 1106 by persuading the Plan's fiduciaries not to investigate the benefits of retaining the Allegheny stock and not to sell the Allegheny stock after the merger. The Union purportedly acted in this manner to maintain positions on the Oremet Board.
 
 
 35
 Plaintiffs fail to identify any transaction that falls within § 1106(a)(1) or (b). They have pointed to nothing akin to a "sale, exchange, or leasing of property, ... [or] the lending of money or extension of credit," all commercial bargains defined by the Supreme Court in Lockheed as falling under § 1106. Lockheed, 517 U.S. at 893, 116 S.Ct. 1783 (internal quotation marks omitted). The decision by the Oremet Defendants to continue to hold 15% of Plan assets in employer stock was not a "transaction." It was merely a lawful decision to remain in full compliance with the explicit language of the Plan's terms. Plaintiffs therefore fail to state a claim for violation of § 1106 based on the Plan fiduciaries' decision to adhere to the Plan's terms.
 
 
 36
 Plaintiffs' prohibited-transaction argument also loses because they have failed to establish that the Union is a fiduciary. Lockheed specifically states that to establish liability under § 1106, a party must prove that "a fiduciary caused the plan to engage in the allegedly unlawful transaction." Id. at 888, 116 S.Ct. 1783. As discussed in the section below, the Union's actions do not constitute those of a fiduciary or even a de facto fiduciary.
 
 
 37
 D. The Union is Not a Plan Fiduciary or a De Facto Fiduciary
 
 
 38
 To be found liable under ERISA for breach of the duty of prudence and for participation in a breach of fiduciary duty, an individual or entity must be a "fiduciary." See 29 U.S.C. §§ 1104-1105. An individual or entity performs a "fiduciary" function with respect to a pension plan when "exercis[ing] any discretionary authority or discretionary control respecting management of such plan or exercis[ing] any authority or control respecting management or disposition of its assets" under ERISA. 29 U.S.C. § 1002(21)(A).
 
 
 39
 Plaintiffs' claim that the Union acted as a fiduciary in its agreement with Oremet not to amend the plan is unavailing. The Plan documents in no way give the Union any discretionary authority or control to manage, administer, or interpret the Plan, or to manage or dispose of the Plan's assets.
 
 
 40
 Though Plaintiffs are correct in pointing out that an individual or entity can still be found liable as a "de facto" fiduciary if it lacks formal power to control or manage a plan yet exercises informally the requisite "discretionary control" over plan management and administration, the Union did not exercise such informal discretionary power. While the Union may have participated in the 1996 Side Agreement not to amend the Plan to permit further diversification, such an agreement did not constitute a fiduciary function, but was rather a plan design or settlor function. As the Supreme Court clearly stated in Lockheed, "because [the] defined functions [in the definition of fiduciary] do not include plan design, an employer may decide to amend an employee benefit plan without being subject to fiduciary review." 517 U.S. at 890, 116 S.Ct. 1783 (internal quotation marks omitted) (bracketed language in original); see also Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 444, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) ("[A]n employer's decision to amend a pension plan concerns the composition or design of the plan itself and does not implicate the employer's fiduciary duties which consist of such actions as the administration of the plan's assets.").
 
 
 41
 Moreover, any suggestion by Plaintiffs that further discovery is necessary to determine whether the Union acted as a fiduciary is contrary to three leading Supreme Court decisions — Lockheed, Hughes Aircraft, and Pegram v. Herdrich, 530 U.S. 211, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000) — all of which affirmed Rule 12(b)(6) dismissals of ERISA claims on the ground that the conduct of the defendant was not that of a "fiduciary," but rather a "settlor."
 
 
 42
 Because the Union was neither a fiduciary nor a de facto fiduciary, the district court did not err in concluding that the Union could not be found liable under ERISA for breach, or participation in the breach, of a fiduciary duty.
 
 E. Key as a Directed Trustee
 
 43
 ERISA relieves a trustee from fiduciary obligations regarding the management and control of a plan's assets when the trustee is "directed" by the plan's designated fiduciaries. A directed trustee is subject only to the "proper directions" of the named fiduciary. See 29 U.S.C. § 1103(a)(1). Directed trustees, as a result, cannot be held liable for following the investment instructions provided by a plan's named fiduciaries. See Herman v. NationsBank Trust Co. (Georgia), 126 F.3d 1354, 1361 (11th Cir.1997); Maniace v. Commerce Bank of Kansas City, N.A., 40 F.3d 264, 267 (8th Cir.1994); Textron, 270 F.Supp.2d at 281 (granting directed trustee's motion to dismiss because "[d]irected trustees ... cannot be held liable for following the investment instructions provided by a plan's named fiduciaries").
 
 
 44
 Plaintiffs argue that Key should be found liable as a "directed trustee" because Key was aware that the fiduciaries' instructions were imprudent and thus it knowingly acted contrary to ERISA. See, e.g., In re WorldCom, Inc., 263 F.Supp.2d 745, 761 (S.D.N.Y.2003) (holding that a directed trustee is obligated "to follow only `proper' directions of the [named fiduciary], directions which were made in accordance with the terms of the [Plan] and which were not `contrary to' the ERISA statute"); Koch v. Dwyer, No. 98 Civ. 5519, 1999 WL 528181, at *9-11 (S.D.N.Y. July 22, 1999) (denying directed trustee's motion to dismiss because directed trustee would have acted contrary to ERISA if it was "aware that the direction to invest in JWP common stock was imprudent or that the fiduciaries' direction to make that investment was based on an inadequate investigation").
 
 
 45
 Because we have rejected Plaintiffs' contention that the decision to hold the company's stock was imprudent, the district court did not err in concluding that Key was immune from liability as a directed trustee. If the underlying fiduciary direction itself is not in violation of ERISA, the directed trustee's compliance with that direction cannot serve as a basis for liability. See In re McKesson HBOC, Inc. ERISA Litig., 2002 WL 31431588, at *12 ("Here, no facts are alleged that would give rise to a conclusion that Chase knew the investment directions it received from the McKesson Plan were imprudent, that Chase had any knowledge of the HBOC accounting irregularities, or that the McKesson Plan Fiduciaries were abusing their discretion in continuing to fund the McKesson Plan pursuant to the Plan terms. Absent such facts, Chase is not liable, and absent non-conclusory allegations of those facts, Chase should not have to defend against the claim.").
 
 III. CONCLUSION
 
 46
 Because the Union and Key are neither fiduciaries nor de facto fiduciaries, they cannot be found liable under ERISA. Based upon the facts alleged, the Oremet Defendants' decision to comply with the lawful terms of the Plan following the merger was entirely consistent with ERISA's fiduciary requirements. The district court's dismissal of Plaintiffs' claims was proper.
 
 
 47
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 See 29 U.S.C. § 1107(d)(3)(A) (defining "eligible individual account plan").
 
 
 [2]
 Unlike traditional pension plans governed by ERISA, EIAPs — and ESOPs in particular — are not intended to guarantee retirement benefits and indeed, by their very nature, "place[] employee retirement assets at much greater risk than does the typical diversified ERISA plan."Martin v. Feilen, 965 F.2d 660, 664 (8th Cir.1992).
 
 
 [3]
 Though we decline at this juncture to adopt wholesale theMoench standard, we do note that stock bonus plans, as present in this case, and ESOPs are both EIAPs and are treated the same for the purpose of fiduciary duty analysis. See Foltz v. U.S. News & World Report, Inc., 865 F.2d 364, 373-74 (D.C.Cir.1989) ("ERISA, far from manifesting any intention to discourage long-term employee ownership, specifically favors that pattern by exempting Employee Stock Ownership Plans from ERISA's 10 percent cap on plans' holdings of `employer securities.' While U.S. News's Plan was not an ESOP [and is a stock bonus plan], ERISA's evident approval of ESOPs precludes any claim that it forbids employee ownership as a legitimate plan objective." (citations omitted)); Steinman v. Hicks, 252 F.Supp.2d 746, 758 (C.D.Ill.2003) (applying the Moench standard to a company profit sharing plan, a non-ESOP EIAP); Landgraff v. Columbia/HCA Healthcare Corp. of Am., No. 3-98-0090, 2000 WL 33726564, at *5 (M.D.Tenn. May 24, 2000), aff'd, 30 FED.App. 366 (6th Cir. Feb. 7, 2002) (applying the Moench standard to a stock bonus plan ("SBP") as "both ESOPs and SBPs are eligible individual account plans subject to the same ERISA requirements"). As noted, EIAPs, which include stock bonus plans, fall within ERISA's diversification and prudence (to the extent that prudence requires diversification) exemptions. See 29 U.S.C. § 1107(d)(3)(A).
 
 
 [4]
 TheMoench standard seems problematic to the extent that it inadvertently encourages corporate officers to utilize inside information for the exclusive benefit of the corporation and its employees. Such activities could potentially run afoul of the federal securities laws. See, e.g., Securities Exchange Act of 1934, §§ 10(b), 21D(b), as amended, 15 U.S.C. §§ 78j(b), 78u-4(b); 17 C.F.R. § 240.10b-5; Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1000 (9th Cir.2002) ("As they pertain to insider trading, Section 10(b), Rule 10b-5, Section 14(e) and Rule 14e-3 make it illegal in some circumstances for those possessing inside information about a company to trade in that company's securities unless they first disclose the information.").
 
 
 [5]
 Plaintiffs point to two decisions that are allegedly counter to this analysis,Stein v. Smith, 270 F.Supp.2d 157 (D.Mass.2003), and Rankin v. Rots, 278 F.Supp.2d 853 (E.D.Mich.2003). Although in both cases the courts, applying Moench, denied 12(b)(6) motions to dismiss, each case is readily distinguishable. In Smith, the complaint specifically alleged that the company's "financial collapse," including "an accumulation of large, undisclosed losses on major projects as well as an impending liquidity crisis that was not adequately disclosed to the public," played a pivotal role in the administrators' breach of their fiduciary duties. 270 F.Supp.2d at 164. Moreover, the complaint alleged that "defendant Smith was integrally involved in making decisions about bidding and disclosure of S & W's finances, and that the other defendants either were aware or should have been aware of the mounting problems." Id. Unlike the present case, and unlike Kuper and Textron, in which the only allegations involved downward fluctuations in stock price, the allegations in Smith clearly implicated the company's viability as an ongoing concern. Similarly, in Rankin, the company at issue (Kmart), went bankrupt. The complaint specifically alleged that the plan administrators "fail[ed] to give Plan participants accurate, complete, non-misleading and adequate information about the compositions of the Plans' portfolios and accurate information about Kmart and its true financial condition." Rankin, 278 F.Supp.2d at 863.
 
 
 [6]
 The Supreme Court further described the type of transactions enumerated in § 1106 inLockheed as follows:
 These are commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length. What the "transactions" identified in § [1106(a)] thus have in common is that they generally involve uses of plan assets that are potentially harmful to the plan.
 517 U.S. at 893, 116 S.Ct. 1783 (citation omitted).