**Dennis SMITH, Individually and on behalf of all others similarly situated, Plaintiff**

v.

**DELTA AIR LINES, INC., Leo F. Mullin, Gerald Grinstein, Benefit Fund Investment Committee, James Broadhead, R. Eugene Cartledge, Mary Johnston Evans, James M. Kilts, Karl J. Krapek, John F. Smith, Jr., Joan E. Spero, Andrew Young, Administrative Committee of Delta Air Lines, Inc., Leon Piper, M. Michelle Burns, Michael J. Palumbo, James B. Taylor Defendants**

No. 1:04 CV 2592.

United States District Court,
N.D. Georgia.
Atlanta Division.

March 31, 2006.

Corey Daniel Holzer, Michael Ira Fistel, Jr., Holzer & Holzer, LLC, Atlanta, GA,

Edward W. Ciolko, Gerald D. Wells, Joseph H. Meltzer, Schiffrin & Barroway, Radnor, PA, for Plaintiffs.

Cindy Dawn Hanson, Steven D. Moore, William Henry Boice, Kilpatrick Stockton, Atlanta, GA, for Defendants.

## ORDER

ORINDA D. EVANS, District Judge.

This is a putative class action brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., in which Plaintiff seeks damages and equitable relief on behalf of himself and those similarly situated. The case is before the Court on Defendants' Motion to Dismiss and Defendants' Request for Oral Argument. For the following reasons, Defendants' Motion to Dismiss [# 44] is GRANTED as to all Defendants except Delta,[1] and Defendants' Request for Oral Argument [# 50] is DISMISSED.

■ In ruling on the Motion to Dismiss, the well-pleaded averments of the Amended Complaint are presumed to be true, *Miree v. DeKalb County*, 433 U.S. 25, 26 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 842 (11th Cir.2004), as are the factual statements in the voluminous documents attached as exhibits to Plaintiff's Amended Complaint.[2] *See* Fed.R.Civ.P.R. 10(c) ("A

---

1. On September 14, 2005, Delta filed a petition for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. The instant action is stayed as against Delta but the case is proceeding against the individual Defendants.

2. The attached documents are as follows:
    *Exhibit A:* Nonpilot Regular Full–Time Benefits Handbook (May 1997) (hereinafter "1997 Benefits Handbook");
    *Exhibit B:* Delta Family–Care Savings Plan (as Amended and Restated Effective April 1,

2003) (hereinafter "2003 Savings Plan Document");
*Exhibit C:* Delta Family–Care Savings Plan (as Amended and Restated Effective July 1, 2001) (hereinafter "2001 Savings Plan Document");
*Exhibits D–F & O:* Various letters;
*Exhibits G–J:* Various amendments to the Trust Agreement;
*Exhibit K:* Delta Family–Care Savings Plan Investment Policy Statement (hereinafter "Investment Policy Statement");

copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *La Grasta*, 358 F.3d at 845 ("In analyzing the sufficiency of the complaint, we limit our consideration to the well-pleaded factual allegations, central to or referenced in the complaint, and matters judicially noticed.").

Plaintiff, an employee of Delta Air Lines, Inc. ("Delta"), was a participant in Delta's Family Care–Savings Plan ("Savings Plan") during the period between September 29, 2000 and September 30, 2004 (the "Class Period") and remains a participant. Plaintiff acquired an interest in Delta stock through his participation in the Savings Plan.

The value of Delta's common stock declined by 92% during the Class Period. Am. Compl. ¶ 163. During the Class Period, Delta sustained losses in thirteen out of fourteen quarters. *Id.* ¶ 156. From 2001 to 2004, Delta lost over 6 billion dollars. *Id.* ¶ 119.

Plaintiff claims that Defendant Delta and the individual Defendants, who were members of Delta's Benefit Fund Investment Committee ("Investment Committee") or members of Delta's Administrative Committee ("Administrative Committee") [3] or key executives of Delta, breached fiduciary duties owed to him under ERISA by allowing the Savings Plan to offer the Delta Common Stock Fund as an investment option, by not warning him against investing in Delta common stock, and by utilizing Delta preferred and common stock to fulfill Delta's matching contribution obligation under the Employee Stock Ownership Program ("ESOP") component of the Savings Plan.

I. *Investment Opportunities Under the Savings Plan*

The Savings Plan is a pension and profit sharing plan that offers certain tax advantages to the participants.[4] *See* 2003 Savings Plan Document, Am. Compl. Ex. B, p. 1 (DAL 000874).[5] During the Class Period, it offered participants two related investment components: (1) an employee choice-of-investment component and (2) the Employee Stock Ownership Program ("ESOP"), through which Delta provided matching contributions of Delta stock. A relationship between the components existed because an employee's contribution (normally through payroll deduction) would trigger the acquisition of investment(s) in the choice-of-investment component as well as a matching contribution (50% of the value of the employee contribution) of Delta stock in the ESOP compo-

---

*Exhibit L:* Third Amendment to Delta Family–Care Savings Plan;

*Exhibit M:* Delta Family–Care Savings Plan Trust Agreement (hereinafter "Trust Agreement");

*Exhibit N:* 1999 Pilot Handbook Updates.

3. The Amended Complaint alleges that members of the Investment Committee were also directors of Delta. It does not allege that they were employees of Delta, unlike the members of the Administrative Committee. *See* Am. Compl. ¶¶ 18–26.

4. The Savings Plan is a "defined contribution plan," meaning "any plan which qualifie[s] under Section 401(a), 401(k), 403(a), or 405(a) of the [Internal Revenue] Code and

which provides for an individual account for each participant and for benefits based solely on the amount contributed to the account, and any income, expenses, gains, losses, and forfeitures that may be allocated to the account." 2003 Savings Plan Document, Am. Compl. Ex. B § 5.02(c), pp. 46–47 (DAL 000919–920).

5. The Court will cite to the 2003 Savings Plan Document (the most recent version) for the sake of consistency and convenience. Plaintiff's Amended Complaint specifically states that with respect to the issues presented in this lawsuit, all versions of the Savings Plan Document relevant to the Class Period were "nearly identical." Am. Compl. ¶ 33 n. 1.

nent. In other words, an employee who acquired investments in the choice-of-investment component would automatically acquire an interest in Delta stock in the ESOP component. All participants in the Savings Plan held Delta stock, even if they did not choose Delta stock in the choice-of-investment component.

The Savings Plan provided that the participants would be responsible for their investment decisions. In defining the term "Named Fiduciary," the 2003 Savings Plan Document states that each participant is a Named Fiduciary with respect to the Delta Common Stock Fund and the ESOP accounts. 2003 Savings Plan Document, Am. Compl. Ex. B § 1.51, p. 14 (DAL 000887). *See also* 1997 Benefits Handbook, Am. Compl. Ex. A, p. 6 (DAL 001663) ("This plan is intended to qualify as a participant directed account Plan under section 404(c) of ERISA. That means [that participants] are responsible for [their] investment decisions under the Plan.").

### 1. Employee Choice–of–Investment Component

This component of the Savings Plan enabled qualifying employees to deduct a percentage of their salary on either an after tax or pretax basis [6] and invest that money in various investment funds. The investment options offered under the Savings Plan as of 2003 were spelled out in Article 7 of the 2003 Savings Plan Document ("Investment Options and Directives"), which provided as follows:

7.01 *Investment Options.* A Participant's Accounts shall be composed of one or more of the following separate accounts:

(a) An account which consists of [employee and employer contributions] directed to be invested primarily in the common stock of the Company . . .

(b) An account which consists of [employee and employer contributions] directed to be invested primarily in equity securities, excluding Employer Securities and Qualifying Employer Securities as such terms are described in Section 407(d) of ERISA.

(c) An account which consists of [employee and employer contributions] directed to be invested primarily in fixed income securities, excluding Employer Securities and Qualifying Employer Securities as such terms are described in Section 407(d) of ERISA.

(d) An account which consists of [employee and employer contributions] directed to be invested primarily in one or more investment contracts issued by major insurance companies.

\*　　\*　　\*　　\*　　\*　　\*

(f) An account which consists of [employee and employer contributions] directed to be invested primarily in a pooled fund which is invested primarily in common stocks that make up the Standard and Poor's 500 Composite Stock Price Index.

(g) An account which consists of [employee and employer contributions] directed to be invested primarily in an investment strategy portfolio in which more than fifty percent (50%) of the assets are in a portfolio of high-quality fixed-income securities and the remaining assets are in diversified portfolios of equity securities.

(h) An account which consists of [employee and employer contributions] directed to be invested primarily in an investment strategy portfolio in which more than fifty percent (50%) of the assets are in diversified portfolios of equity securities and the remaining assets are in a portfolio of high quality fixed-income securities.

---

**6.** *See* 26 U.S.C. §§ 401(a) and (k), respectively.

(i) An account which consists of [employee and employer contributions] directed to be primarily invested in the one or more of all Fidelity mutual funds included in the Fidelity FundsNet funds and other mutual funds offered through FundsNet, as determined from time to time and communicated to Participants. A Participant may invest his current [employee and employer contributions] in increments of at least 5% in each mutual fund (for a total of not more than 20 mutual funds). A separate account shall be established for each such mutual fund in which a Participant invests.

(j) An account which consists of [employee and employer contributions] directed to be invested primarily in an investment strategy portfolio in which 50% of the assets are in diversified portfolios of equity securities and 50% of the assets are in a portfolio of high-quality fixed-income securities.

(k) Effective October 1, 2001, an account which consists of amounts arising from Employee Contributions, Cash Rollover Contributions and Elective Transfer Contributions directed to be invested in an individual mutual fund brokerage account offered by an investment firm or brokerage house (the "Mutual Fund Brokerage Account") selected by the Company, which investment firm or brokerage house may change from time to time. . . .

(*l*) Effective October 1, 2001, an account which consists of [employee and employer contributions] directed to be primarily invested in high quality U.S. government and agency securities, as well as certificates of deposit, by the Delta Employees Credit Union. . . .

2003 Savings Plan Document, Am. Compl. Ex. B § 7.01, pp. 69–72 (DAL 000942–945).

The role of the Investment Committee was to select the investment opportunities which would be made available within some but not all of the categories listed under Section 7.01. *See id.* at § 13.08, pp. 104–05 (DAL 000977–978); Trust Agreement, Am. Compl. Ex. M § 4(b), p. 4 (DAL 001537). For example, the Investment Committee had the responsibility for selecting the equity securities which would be offered pursuant to Section 7.01(b). However, the Investment Committee did not make the decision to offer Delta common stock under Section 7.01(a). That was a decision made by Delta, the Savings Plan's sponsor.

Participants could allocate the percentage of their contributions among the foregoing funds with one exception: employees could not allocate greater than fifty percent (50%) of their contributions to the Delta Common Stock Fund, the fund established under Section 7.01(a) of the 2003 Savings Plan Document. *See* 2003 Savings Plan Document, Am. Compl. Ex. B § 7.03, p. 74 (DAL 000947).

Participants were immediately vested in their contributions and all investment earnings, meaning that they were entitled to the value of the investments in their accounts upon withdrawal from the Savings Plan. *Id.* § 9.01(a), p. 79 (DAL 000952). Participants could move their investments from one choice-of-investment account to another at any time. *Id.* § 7.02, pp. 73–74 (DAL 000946–947). Participants also could obtain complete or partial withdrawals of the value of their investment accounts, subject to certain limitations under the Savings Plan, *see id.* § 9.02(b)-(c), pp. 84–88 (DAL 000957–961), and restrictions and penalties imposed by federal tax laws.

Upon retirement (or another Event Date [7]), participants were entitled to be

---

**7.** An Event Date "means for each Participant, the earliest of: (a) the date of determination

paid a monthly amount, based on the amount in the account and the participant's life expectancy. *Id.* § 9.03(a), p. 88 (DAL 000961). The payments would conclude when the account was depleted. *Id.* A cash lump sum payment was available as an alternative. *Id.* § 9.03(b), pp. 88–89 (DAL 000961–962).

### 2. *The ESOP Component*

Delta created the ESOP in 1989 by amending the Savings Plan. 2003 Savings Plan Document, Am. Compl. Ex. B, p. 1 (DAL 000874). The Amended Complaint does not include an attachment reflecting the 1989 amendment, but the 2001 and 2003 Savings Plan Documents which are attached include the ESOP provisions. Moreover, in light of Plaintiff's statements in the Amended Complaint that the provisions of the 1993, 2001, and 2003 Savings Plan Documents are not materially different, Am. Compl. ¶ 33 n. 1, the Amended Complaint does provide the relevant ESOP

provisions of the Savings Plan at all times during the Class Period.

The ESOP is a stock bonus plan through which Delta contributed to participants' accounts. Delta's contributions were made in the form of Delta preferred or common stock, or in certain cases, cash.[8] For every dollar contributed by participants to the choice-of-investment component of the Savings Plan, Delta contributed $0.50 worth of Delta convertible preferred stock to the participant's account in an amount not to exceed 2% of the participant's salary in the ESOP component of the Savings Plan.

A participant ESOP account is described in the 2003 Savings Plan Document as follows:

> An account which consists of (1) ESOP Preference Shares including but not limited to shares allocated by reason of the repayment of an ESOP Loan; (2) subject to the limitations in Section 4.04(f),[9] shares of common stock of the

that the Participant is disabled ...; (b) his date of death; (c) on the date he retires ...; or (d) a Participant's Employment Termination Date ..." 2003 Savings Plan Document, Am. Compl. Ex. B § 1.44, pp. 11–13 (DAL 000884–886).

**8.** The Savings Plan specified an Annual Cap on the value of Delta ESOP securities used to satisfy Delta's matching contribution obligation. *See* 2003 Savings Plan Document, Am. Compl. Ex. B § 4.04(f), p. 39 (DAL 000912). This limit increased by $50 each year. In 2000, for example, the limit was $1,550. Thus, the first $1,550 of the matching contribution was satisfied using Delta securities from the ESOP (i.e., the participant received $1,550 worth of convertible preferred or common stock). If Delta still owed a particular participant more under its commitment to match 50% of the participant's contribution not to exceed 2% of the participant's salary, Delta would satisfy the balance through a cash contribution, which would be transferred to the choice-of-investment component and allocated as provided by the participant's designation.

**9.** Section 4.04(f) deals with the situation in which the value of the Delta preferred stock to be distributed to participants' accounts is less than the value of the matching contribution owed to participants. Section 4.04(f) provides that in this situation, Delta shall make a "Supplemental Contribution by either (1) pre-paying the ESOP Loan to release additional ESOP Preference Shares; (2) contributing cash to the Savings Fund which the Trustee shall use to buy common stock of the Company on the open market; or (3) contributing shares of common stock of the Company." This Section also specifies that in all situations in which Delta's matching contribution exceeds the Annual Cap applicable for that year, the portion of the matching contribution in excess of the Annual Cap would be in the form of cash. The cash would be invested in the same manner as the participant's contributions were invested in the choice-of-investment component of the Savings Plan.

Company contributed by the Company pursuant to Section 4.04(f) or purchased by the Trustee from the proceeds of cash contributions of the Company pursuant to Section 4.04(f); and (3) shares of common stock of the Company contributed by the Company or purchased by the Trustee pursuant to Section 4.04(b).[10]

2003 Savings Plan Document, Am. Compl. Ex. B § 7.01(e), p. 70 (DAL 000943).

The ESOP portion of the Savings Plan did not allow participants to sell their interest in Delta securities. *Id.* § 7.04(a), pp. 74–75 (DAL 000947–948). Selling this interest was an option only for a "participant who has attained the age 55, has completed at least ten (10) years of participation in the ESOP, and whose [ESOP] account ... has a Current Market Value greater than five hundred dollars ($500)." *Id.* § 7.04(a), p. 74 (DAL 000947).

Upon retirement or another Event Date, participants are entitled to receive shares of Delta stock or a cash payment. *Id.* § 9.04(a), p. 90 (DAL 000963).

The Investment Committee did not select Delta preferred and common stock as the vehicle for Delta's matching contributions to participants' accounts. That was determined by the terms of the Savings Plan itself as set forth in Section 7.01(e).

II. *Structure of the Savings Plan and the Trust and Defendants' Roles*

Delta originally established the Savings Plan in 1971. 2003 Savings Plan Document, Am. Compl. Ex. B, p. 1 (DAL 000874). Delta is the only signatory to the Savings Plan. *Id.* at DAL 001101. The Savings Plan has been amended and restated a number of times. The 2003 Savings Plan Document is 127 pages long (excluding appendices) and is a detailed and complicated document.

Briefly, the 2003 Savings Plan Document sets out who is eligible to participate (Article 2), details concerning ESOP Loans (Article 3), the contributions which may or must be made by the employer and the employee (Article 4), limits on contributions (Articles 5 and 6), employees' investment options and directives (Article 7), computation of participant account values (Article 8), distributions to participants (Article 9), names of the employing companies (Article 10), the relevance of prior Plans (Article 11), establishment of a Savings Fund (trust fund) and a Trustee for the Savings Plan (Article 12), the establishment of administration and fiduciaries for the Savings Plan (Article 13), participant claims procedures (Article 14), and miscellaneous other provisions. The Savings Plan begins with sixteen (16) pages of defined terms in Article 1, the definitions section. The sections of the Savings Plan which are of particular relevance to the pending motion to dismiss are: definitions (Article 1), mandatory and permissive contributions (Article 4), investment options and directives (Article 7), establishment of the Savings Fund (Article 12), and the

---

**10.** Section 4.04(b) deals with the allocation of "Allocated Dividends," which are defined as "dividends paid on those ESOP Preference Shares which are credited to a Participant's [ESOP account] as of the record date for the payment of that dividend." 2003 Savings Plan Document, Am. Compl. Ex. B § 1.05, p. 3 (DAL 000876). "The Allocated Dividends which are paid twice each year shall be initially paid to the ESOP Holding Account, where such cash shall remain until the next repayment of the ESOP Loan is made.... In the event that there are no ESOP Preference Shares remaining in the ESOP Holding Account as of the date that the Allocated Dividends are paid or there are not enough ESOP Preference Shares to provide for the full value of the Allocated Dividends ..., then the Employing Company may pre-pay the ESOP Loan to release additional ESOP Preference Shares or the Trustee shall buy common stock of the Company on the open market or otherwise." *Id.* § 4.04(b), pp. 35–36 (DAL 000908–909).

section on administrators and fiduciaries (Article 13), which creates the Administrative and Investment Committees for the Savings Plan and defines the roles and duties of those committees.

As noted in Plaintiff's Amended Complaint, Am. Compl. ¶ 18, the Savings Plan establishes the Investment Committee (Section 13.08). It expressly states that the "Investment Committee of the Board of Directors of the Company shall be the Named Fiduciary of this [Savings Plan] for purposes of formulating and managing the investment policies and controlling the assets of the [Savings Plan] (to the extent that such control is not part of the responsibility of the Administrative Committee to direct the payment of benefits or reasonable expenses in its administration of the [Savings Plan])." 2003 Savings Plan Document, Am. Compl. Ex. B § 13.08, p. 104 (DAL 000977). Section 13.08 states that the "Investment Committee shall have the authority to: ... appoint (and to discharge) trustees and investment managers ... [and] manage any or all assets of the [Savings Plan]." *Id.* § 13.08(b)-(c), pp. 104–05 (DAL 000977–978).

Section 13.01 establishes the Administrative Committee, which is the "Named Fiduciary of the Plan for purposes of operation and administration of the Plan, and, in addition, any duty which is not expressly allocated to the [Investment Committee] or a Participant ..., or with respect to which an allocation is in doubt, shall be deemed to be allocated to the Administrative Committee." 2003 Savings Plan Document, Am. Compl. Ex. B § 13.01, p. 100

(DAL 000973). The Administrative Committee is not "responsib[le] for investment and control of assets, which is given to the [Investment Committee] pursuant to Section 13.08 of this [Savings Plan] and to Participants under Section 13.11 [11] of this [Savings Plan]." *Id.*

Article 12 of the Savings Plan required Delta to establish a Trust to hold the assets of the Savings Plan. Section 12.01 provides that "[t]he Company shall establish a Savings Fund with a Trustee or more than one Trustee, and shall enter into a Trust Agreement with such Trustee which shall be a part of the [Savings Plan]." *Id.* § 12.01, p. 98 (DAL 000971). Section 12.01 further states that the contributions of the employer and each participant "shall be paid into the Savings Fund." *Id.* Thus, this Article requires that both the contributed stock and the cash contributions made by the parties be paid into the Savings Fund or "Trust."

The structure and operation of the Trust are largely driven by the terms of the Savings Plan. The Savings Plan allows the Trustee to borrow money to finance the purchase of "ESOP Preference Shares" which will be used to match employee contributions under the Savings Plan with Delta preferred stock. *See* 2003 Savings Plan Document, Am. Compl. Ex. B § 3.01, pp. 24–25 (DAL 000897–898).[12] ESOP Preference shares are defined as "shares of Convertible Preferred Stock purchased with the proceeds of an ESOP Loan and the shares of common stock of the Company into which they are convert-

---

**11.** The Savings Plan notes in Section 13.11 that each Savings Plan participant is designated a " 'Named Fiduciary' ... with respect to ESOP Preference Shares and common stock of the Company allocable to or held in [the participant's] accounts described in Sections 7.01(a) and/or 7.01(e)" and in other respects as well. 2003 Savings Plan Docu-

ment, Am. Compl. Ex. B § 13.11, p. 106 (DAL 000979).

**12.** According to a Delta Investment Policy Statement, the initial "ESOP Loan" was in 1989 and enabled the Trustee to purchase approximately 6.944 million shares of Delta preferred stock. Investment Policy Statement, Am. Compl. Ex. K, p. 1 (DAL 001686).

ed." *Id.* § 1.43, p. 11 (DAL 000884). "ESOP Loans" are secured with the "ESOP Preference Shares." *Id.* § 3.01(d), p. 24 (DAL 000897). Encumbered ESOP Preference Shares are held by the Trustee in a "Suspense Account." *Id.* § 4.04(a), p. 35 (DAL 000908). As the ESOP Loan is paid down (with payments by the Trustee or by Delta contributions to the Trust), *id.* § 3.02, pp. 25–26 (DAL 000898–899), the ESOP Preference Shares become unencumbered and are released to an ESOP Holding Account which is also held by the Trustee. *Id.* § 4.04(a), p. 35 (DAL 000908). When dividends are paid on ESOP Preference Shares, they are held in the ESOP Holding Account and credited to that account. *Id.* § 4.04(b), pp. 35–36 (DAL 000908–908). As participants make payroll contributions to the Savings Plan, the Trustee is directed to allocate the appropriate 50% matching amount of ESOP Preference Shares to the participants' individual ESOP Accounts. *Id.* § 4.03(a), pp. 33–34 (DAL 000906–907).

Attached to the Amended Complaint is a copy of the 1993 Trust Agreement ("Trust Agreement") between Delta Airlines and Fidelity Management Trust Company ("Fidelity" or "Trustee"), entitled "Delta Family Care Savings Plan Trust."

The Trust Agreement appoints Fidelity as Trustee and contains Fidelity's commitment to act as Trustee. The document is signed by both parties. The document makes it clear that the Trustee is to have very little discretion. *See generally* Trust Agreement, Am. Compl. Ex. M § 4, pp. 4–22 (DAL 001537–1555). The Trustee is to manage the assets within the framework established by the Savings Plan and in response to specific direction from the Named Fiduciary, including the Investment Committee and Savings Plan participants. The Trust Agreement also provided that Fidelity would "make disbursements in the amounts and consistent with guidelines that the [Administrative Committee] directs from time to time in writing." *Id.* § 3(a), p. 4 (DAL 001537).

The Trust Agreement provides that "Trust investments in Sponsor Stock shall be made via the Delta Common Stock Fund, the Delta Leveraged ESOP Fund: Common Stock, and the Delta Leveraged ESOP Fund: Preferred Stock." *Id.* § 4(f), p. 7 (DAL 001540). The Trust Agreement further provides in § 4(f)(i) that the "Delta Common Stock Fund shall consist of common shares of Sponsor Stock and short-term liquid investments ... necessary to satisfy the Fund's cash needs for transfers and payments. A cash target range shall be determined in conjunction with the Sponsor for the cash portion of the Delta Common Stock Fund." Finally, the Trust Agreement states that "[d]ividends received by the Delta Leveraged ESOP Fund: Common Stock shall be held in a short-term liquid investment in the Fund or reinvested in Sponsor Stock as directed by the Sponsor." *Id.* § 4(f)(ii), p. 8 (DAL 001541). "Dividends received by the Delta Leveraged ESOP Fund: Preferred Stock shall be held in a short-term liquid investment as directed by the Sponsor and the proceeds shall be applied to the outstanding loan balance." *Id.* § 4(f)(iii), p. 8 (DAL 001541).

Fidelity is not a party defendant in this action.

## III. *Events During and Immediately After the Class Period*

Paragraphs 82 through 193 of the Amended Complaint outline in rambling fashion the reasons for the financial downturn of Delta Airlines and its stock during the Class Period. The stated reasons can be summarized as follows: (1) competition from discount airlines; (2) the fact that competitor airlines filed for bankruptcy be-

fore Delta did, enabling them to conduct leaner operations; (3) the events of September 11, 2001; (4) the creation of too much debt; (5) the creation of large cash reserves; (6) the high cost of fuel; and (7) insufficient cost-cutting measures, especially the failure to negotiate salary cuts with Delta's pilots' union.

The Amended Complaint outlines that at times in 2004, Delta officials publicly mentioned the possibility of bankruptcy. The gist of the Complaint is that the Defendants knew, at least from 2001 to 2004, that Delta was in financial difficulty and that Delta's stock was declining significantly in value. Plaintiff alleges that, therefore, it was imprudent for Defendants to continue to include Delta stock as part of the Savings Plan.

Plaintiff asserts that Defendants should have "divest[ed] the [Savings Plan] of Delta securities to the extent possible," Am. Compl. ¶ 184, and that Defendants should have discontinued or changed the part of the Savings Plan which called for matching employee contributions with Delta stock. *See id.* Plaintiff also alleges that Defendants should have warned participants not to select the Delta Common Stock Fund as an investment choice but instead to select other options offered in the Savings Plan. Finally, Plaintiff asserts that Defendants' public filings and releases were "inaccurate, incomplete and materially misleading," *id.* ¶ 188; that Defendants made "public misrepresentations and inflated forecasts," *id.* ¶ 230; and that they misled participants by not "disclosing negative material information," *id.* ¶ 185.

The Amended Complaint does not state in what respect the releases were inaccurate, incomplete, or misleading; what misrepresentations were made; or what negative material information was not disclosed.

The Amended Complaint critically mentions that in January 2002, thirty-five "top executives" were awarded "bankruptcy proof" pensions. *See* Am. Compl. ¶ 111. It also states that at "private meetings" with employees in early 2004, Defendants mentioned the possibility of bankruptcy. *Id.* ¶ 146. Nevertheless, the Amended Complaint is replete with public statements attributed to Defendants or their agents concerning Delta's serious financial problems throughout 2001–2004.

The Complaint chronicles Delta's losses during 2001 through 2004. It states that after Delta's CEO Defendant Mullin stepped down at the end of 2003, his successor, Defendant Grinstein, began mentioning the possibility of bankruptcy. Grinstein emphasized that if the company could not reduce costs, curb losses and raise capital, and in particular convince its pilots to take a pay cut, the company might have to seek bankruptcy protection. *Id.* ¶ 150. Delta announced in May 2004 that it had hired The Blackstone Group, an investment bank, in preparation for its possible Chapter 11 filing. *Id.* ¶ 152.

On July 27, 2004, Delta amended its Savings Plan to clarify and augment the powers of the Investment Committee as to the Savings Plan's investments in the Delta Common Stock Fund and the ESOP funds. *See* Am. Compl. Ex. L. This amendment gave the Investment Committee the right to impose limitations or restrictions on the Savings Plan's investments in the Delta Common Stock Fund and in the ESOP Stock Fund, even to the point of eliminating these funds as part of the Savings Plan. It specified that the Investment Committee could "sell or otherwise dispose of all or any portion of the common stock of the Company or ESOP Preference Shares held in the Delta Stock Fund and/or the ESOP Stock Fund." *Id.* at p. 1 (DAL 000848). It specified, as had the 2003 Savings Plan Document, that the Investment Committee could "appoint (and

discharge) an investment manager." *Id.* at p. 2 (DAL 000849). This amendment then went on to say the following:

> Notwithstanding the foregoing, the Company reaffirms its intent that . . . the Delta Stock Fund and the ESOP Stock Fund shall continue to be primarily invested in common stock of the Company and/or ESOP Preference Shares, as applicable, unless, using an abuse of discretion standard, it is clearly determined by the fiduciary with allocated responsibility for such fund that the financial collapse and bankruptcy of the Company are unavoidable . . .

*Id.* The amendment further stated:

> The Company further clarifies and confirms its intent that in establishing the ESOP Stock Fund, it intended to align the interests of shareholders and Company employees and any action that frustrates that purpose is contrary to this intent. The Company also clarifies and confirms its intent that any decision by the fiduciary with allocated responsibility should consider all provisions of ESOP Preference Shares.

*Id.* at pp. 2–3 (DAL 000849–850).

Between July 14, 2004 and September 23, 2004, Delta and Fidelity amended the Trust Agreement.[13] One of the changes was to state that the Delta Common Stock Fund "shall consist of common shares of Sponsor Stock and, in order to provide the necessary monies for *exchanges or redemptions*, a liquidity reserve allocated to the Delta Common Stock Fund [through certain money market or similar liquid investments]. . . . A cash target range shall be determined in conjunction with the Sponsor for the cash portion of the Delta Common Stock Fund." Am. Compl. Ex. J § 2(f)(i), p. 1 (DAL 001471) (emphasis sup-

plied). The 1993 Trust Agreement had provided that the Delta Common Stock Fund "shall consist of common shares of Sponsor Stock and short-term liquid investments, including a commingled money market fund . . . maintained by the Trustee, necessary to satisfy the Fund's cash needs for *transfers or payments*. A cash target range shall be determined in conjunction with the Sponsor for the cash portion of the Delta Common Stock Fund." *Id.* Ex. M § 4(f)(i), pp. 7–8 (DAL 001540–1541) (emphasis supplied). Thus, the September 23, 2004 amendment to the Trust Agreement made it clear that the Delta Common Stock Fund had to have enough liquidity to pay participants who elected to sell their interest in that fund or draw the funds out of the Savings Plan. However, it *did not* alter the fact that the amount of cash reserves was to be set by agreement between Delta as Sponsor and Fidelity as Trustee. The Investment Committee did not have a role in setting the level of cash reserves.

Between August 2, 2004 and September 2, 2004, Delta and Fidelity amended the Trust Agreement again.[14] This amendment recognized that Delta had amended the Savings Plan to permit the appointment of an independent investment manager with respect to the Delta Common Stock Fund and the ESOP Funds and that the investment manager would be "a fiduciary within the meaning of ERISA with respect to the Stock Funds." Am. Compl. Ex. G, p. 1 (DAL 001409). The investment manager would be acting independently to monitor the suitability of the two stock funds under the fiduciary rules of ERISA. *Id.* at 2 (DAL 001410). This would not be the responsibility of the Trustee. *Id.* at 3

---

**13.** This was denominated the Twelfth Amendment to the Trust Agreement. Delta signed on July 14, 2004 and Fidelity signed on September 23, 2004.

**14.** The Twenty–Third Amendment to the Trust Agreement was signed by Delta on August 2, 2004 and by Fidelity on September 2, 2004.

(DAL 001411). This amendment also specified that the investment manager would "determine the percentage of the Stock Funds' assets to be invested in cash or cash equivalent investments." *Id.* at 2 (DAL 001410). The investment manager could limit or restrict the purchase of interests in the funds by Savings Plan participants. *Id.* The investment manager could even determine that the funds would no longer be available as an investment option under the Savings Plan and that the funds could be liquidated. *Id.*

Paragraph 46 of the Amended Complaint states that "as of the close of the Class Period," the Investment Committee appointed U.S. Trust to be the independent manager for the Delta ESOP funds and the Delta Common Stock Fund. No specific date for U.S. Trust's appointment is stated. On September 30, 2004 (the last day of the Class Period), U.S. Trust sent a letter to all Savings Plan participants, stating the following:

> Over the past several weeks, we have been reviewing the publicly available information relating to Delta's financial condition and have consulted with various financial analysts who follow Delta and the airline industry and with our own financial advisor. Because of a number of factors that are bringing increased financial pressure on Delta—the continuing rise in oil prices, a weakening economy, decreased pricing power and lower revenue—we have decided that, in order to discharge our fiduciary duty to Savings Plan participants, we will begin selling the Delta common stock held in the ESOP component of the Savings Plan.
>
> We are starting with the common stock in the ESOP component because Savings Plan participants cannot exercise investment control over the ESOP common stock and because we believe that the immediate sale of all of the common stock held by the Savings Plan would

adversely affect the trading price of the common stock. We intend to manage the sale of the common stock in an orderly manner, and we will limit the number of shares that we sell on any day to minimize the impact of the sales on the common stock price . . .

> In the meantime, each of you who has an account balance in the Delta Stock Fund should give serious and careful consideration as to whether you should direct the Savings Plan trustee to liquidate your balance in that fund . . . You should also consider that, in the event of bankruptcy, it is highly likely, if not certain, the Delta common stock will lose all of its value and that you may have a limited opportunity to preserve value by selling the Delta common stock now.

Am. Compl. Ex. O.

In December 2004, Delta sent participants the following letter, indicating that U.S. Trust had sold some of the Delta ESOP common stock holdings and that it had halted investment in the Delta Common Stock Fund:

> As you were previously informed, U.S. Trust, the independent fiduciary and investment manager for the Delta ESOP Preferred and Common Stock Funds, directed Fidelity Investments to sell some of the Delta common shares held in the Delta Common ESOP Fund. The proceeds of these sales had been held in the cash component of the Delta Common ESOP Fund.
>
> U.S. Trust directed Fidelity to reallocate a portion of this cash from the Delta Common ESOP Fund to the Fidelity Retirement Money Market Portfolio, one of the investment options available in the [choice-of-investment component of the Savings Plan]. This reallocation took place on November 19, 2004. . . .

Please be aware that shares of Delta common stock were *not* reallocated. The monies reallocated came from the portion of the Delta Common ESOP Fund that invests in short-term investments, typically referred to as the "cash" portion.

You may diversify the balance that was reallocated to the Fidelity Retirement Money Market Portfolio by requesting an exchange into other investment options in the [choice-of-investment component of the Savings Plan]. The standard ESOP diversification restrictions and requirements . . . do not apply to this reallocated money. . . . Keep in mind that the Delta Common Stock Fund is closed to new monies, so you may not exchange into or direct contributions to the Delta Common Stock Fund at this time.

Am. Compl. Ex. F.

In summary, once U.S. Trust became the independent investment manager for the Delta funds, it sold the unencumbered (but as yet unallocated) Delta common shares in the ESOP Holding Account and put the cash proceeds from the sale into one of the money market funds in the choice-of-investment component of the Savings Plan. Participants were told, essentially, that they were free to leave the money there or transfer it to another of the choice-of-investment options (other than the Delta Common Stock Fund). Also, U.S. Trust informed participants that they could no longer put new money into the Delta Common Stock Fund and advised them to seriously consider selling their interest in that fund. These moves by U.S. Trust had no effect on preferred and common shares in the ESOP fund which had been allocated to participants' accounts, and did not affect the holdings in the Delta Common Stock Fund which participants chose not to sell.

The Amended Complaint does not criticize the actions taken by U.S. Trust. Rather, it suggests that Defendants were negligent in failing to implement these steps earlier.

██ The instant lawsuit was filed on September 4, 2004, and the Amended Complaint was filed on March 16, 2005. The instant Motion to Dismiss was filed on April 15, 2005. As requested by the parties, the Court takes judicial notice that Delta Airlines filed a Chapter 11 reorganization petition on September 14, 2005.

## DISCUSSION

### I. Standard on a Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) empowers the Court to grant a defendant's motion to dismiss when a complaint fails to state a claim upon which relief can be granted. The pleadings are construed broadly so that all well-pleaded facts are accepted as true, and all inferences are viewed in a light most favorable to the plaintiff. *Cooper v. Pate*, 378 U.S. 546, 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); *Conner v. Tate*, 130 F.Supp.2d 1370, 1373 (N.D.Ga.2001). However, the court need not "accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). Additionally, "[c]onclusory allegations and unwarranted deductions of fact are not admitted as true, especially when such conclusions are contradicted by facts disclosed by a document appended to the complaint. If the appended document . . . reveals facts which foreclose recovery as a matter of law, dismissal is appropriate." *Associated Builders, Inc. v. Alabama Power Co.,* 505 F.2d 97, 100 (5th Cir.1974).[15]

15. This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

A motion to dismiss should be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Linder v. Portocarrero,* 963 F.2d 332, 334 (11th Cir.1992).

## II. *ERISA*

Congress passed ERISA in 1974, in part, "to establish minimum standards of fiduciary conduct for Trustees, Administrators and others dealing with retirement plans . . . and to improve the equitable character and soundness of private pension plans." H.R.Rep. No. 93–533 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 4639, 4655. ERISA defines a fiduciary as follows:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

■ Fiduciaries are held to the prudent man standard of care, which includes four duties: (1) to act solely in the interest of the participants and beneficiaries; (2) to exercise care, skill, prudence, and diligence; (3) to diversify the investments of the plan to minimize risk of loss unless imprudent to do so under the circumstances; and (4) to deal in accordance with the documents and instruments governing the plan unless to do so would violate ERISA. *Id.* § 1104(a)(1).[16]

ERISA contains specific provisions for eligible individual account plans ("EIAPs") such as Delta's Savings Plan. An EIAP is an individual account plan which is "(i) a profit-sharing, stock bonus, thrift, or savings plan [or] (ii) an employee stock ownership plan," 29 U.S.C. § 1107(d)(3)(A), and which "explicitly provides for acquisition and holding of qualifying employer securities." *Id.* § 1107(d)(3)(B). Because EIAPs are designed to hold employer securities, they are excepted from ERISA's general prohibition against a plan acquiring or holding such securities in an amount greater than ten percent (10%) of the fair market value of the assets in the plan. *Id.* § 1107(a)(2).

For the same reason, EIAP fiduciaries do not have a duty to diversify and do not act imprudently by not diversifying the assets of an EIAP. ERISA explicitly states that "the diversification requirement . . . and the prudence requirement (only to the extent that it requires diversification) . . . is not violated by acquisition or holding of . . . qualifying employer securities." *Id.* § 1104(a)(2).

## III. *Count I: Failure to Prudently and Loyally Manage*

Count I alleges that both Delta and the individual Defendants breached their duty to "prudently and loyally manage" the Savings Plan's assets with respect to the ESOP component and the Delta Common Stock Fund. Because this case is stayed as against Delta, the Court does not consider

---

**16.** ERISA provides that in the case of a pension plan which establishes individual accounts and allows participants to exercise control over the assets in their account, "no person who is otherwise a fiduciary shall be liable under this part for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control." 29 U.S.C. § 1104(c)(1)(B). Section 1104(c)(1)(B) is in the nature of an affirmative defense and therefore is inappropriate to consider at the motion to dismiss phase. *Woods v. Southern Co.,* 396 F.Supp.2d 1351, 1367 (N.D.Ga.2005). Defendants do not raise this provision in their Motion to Dismiss and the Court did not consider it in this Order.

Plaintiff's claim that Delta, as the Savings Plan's sponsor, failed to act prudently in establishing or in failing to amend the Savings Plan, or in any other respect. Plaintiff claims that the individual Defendants, as fiduciaries, should have disregarded the Savings Plan's directive pertaining to investment in Delta securities under the circumstances outlined in Plaintiff's Amended Complaint. "Plaintiff [does not] contest that the ERISA statute permits ESOP and other individual account defined contribution plans to invest heavily in an employer-sponsor's equity over time, *if it is prudent to do so.*" Pl.'s Resp. 8 n. 7 (emphasis in original).[17] Plaintiff essentially alleges that Defendants acted imprudently by not diversifying, or, as Plaintiff puts it, by "maintaining the Plan's preexisting heavy investment in Delta securities when the stock no longer was a prudent investment for the Plan." Am. Compl. ¶ 5.

■ As an initial matter, Count I cannot survive as against the Administrative Committee and its members. The 2003 Savings Plan Document (which is part of the Amended Complaint) makes clear that the Administrative Committee has no discretion to discontinue investment into the Delta Common Stock Fund or alter or modify the ESOP. The Administrative Committee was the "Named Fiduciary of the Plan for purposes of operation and administration of the Plan, and, in addition, any duty which is not expressly allocated to the [Investment Committee] or a Participant . . . , or with respect to which an allocation is in doubt, shall be deemed to be allocated to the Administrative Committee." 2003 Savings Plan Document, Am. Compl. Ex. B § 13.01, p. 100 (DAL 000973). The actions which Plaintiff claims Defendants should have taken related to investment decisions under the Savings Plan, which were the responsibility of the Investment Committee. *See id.* § 13.08, pp. 104–05 (DAL 000977–978). Therefore, the Administrative Committee was not a Named Fiduciary with respect to investment decisions.

Nor can the Administrative Committee and its members be held liable as co-fiduciaries of the Savings Plan. As stated above the Administrative Committee was not a Named Fiduciary with respect to investment decisions; therefore, they cannot be co-fiduciaries with respect to such decisions.

■ Furthermore, Count I cannot survive as against Defendants Mullin and Grinstein, because they were not fiduciaries with respect to investment decisions. Plaintiff's Amended Complaint states in conclusory fashion that Mullin and Grin-

---

**17.** Count I of Plaintiff's Amended Complaint alleges that Delta's *formulation* of the Savings Plan to include the Delta Common Stock Fund and Delta's stock in the ESOP was imprudent. Defendants argue that establishment and design of the plan was within Delta's bailiwick as settlor of the Trust and is not governed by ERISA's fiduciary duties. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) ("ERISA's fiduciary duty requirement simply is not implicated where Hughes, acting as the Plan's settlor, makes a decision regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculat-

ed."); *Lockheed Corp. v. Spink*, 517 U.S. 882, 890, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996) ("Plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries."). However, Plaintiff's response brief states that he has no intention of attacking the initial design of the Savings Plan. Plaintiff "is merely declaring that Defendants violated their ERISA mandated duty of ignoring [Savings Plan] documents when following them was *imprudent to do so.*" Pl.'s Resp. Br. 8 n. 7. Because the case is stayed as to Delta, the Court need not pursue the issue of whether Delta had any fiduciary responsibilities under the Savings Plan.

stein were fiduciaries "of the Plan in that [they] exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets." Am. Compl. ¶¶ 16–17. However, the 2003 Savings Plan Document (which is part of the Amended Complaint) belies these allegations. Mullin and Grinstein were not members of the Investment Committee, therefore they were not fiduciaries with respect to investment decisions.

As members of the Board of Directors, Mullin and Grinstein did play a role in appointing the members of the Investment Committee. However, as the Court concludes that the Investment Committee acted prudently, Mullin and Grinstein do not have any possible liability for appointing imprudent committee members. If Mullin and Grinstein had failed to disclose material information relating to Delta's financial health, it may be plausible to argue that they should be liable for failing to inform the Investment Committee. However, as discussed in greater detail below, Plaintiff's allegations regarding failure to disclose are too vague and conclusory to sustain a claim against any of the Defendants.

In sum, the Court grants Defendants' Motion to Dismiss with respect to the Administrative Committee and Mullin and Grinstein, leaving only the members of the Investment Committee as Defendants.[18]

With respect to the Investment Committee, Plaintiff presents a slippery argument. Obviously cognizant of 29 U.S.C. § 1104(a)(2)'s provisions, Plaintiff does not directly allege that the Investment Com-

mittee members failed to diversify the ESOP and the Delta Common Stock Fund. Rather, Plaintiff attempts to argue around ERISA's diversification exemption by alleging that the Savings Plan's heavy investment in Delta securities was imprudent irrespective of the lack of diversification. At its core, however, Count I just amounts to another form of diversification argument. Section 1104(a)(2) speaks to such an argument, exempting not only the duty to diversify but also the duty of prudence to the extent it requires diversification. Therefore, regardless of Plaintiff's phraseology, a strict application of § 1104(a)(2) mandates dismissal of Count I as to the members of the Investment Committee.

Nonetheless, in *Moench v. Robertson,* 62 F.3d 553 (3d Cir. Aug.10, 1995), the United States Court of Appeals for the Third Circuit declined to literally apply § 1104(a)(2). The Court held that where the ESOP plan[19] required the ESOP committee to invest "primarily" in employer stock, the committee had discretion to invest in non-employer securities (including money market funds or other cash equivalents). The Court held that the committee's failure to invest in something other than employer stock could be actionable, notwithstanding the language of § 1104(a)(2), if the Committee abused its discretion in failing to make other investments. *Moench,* 62 F.3d at 571. An abuse of discretion could occur when the employer stock was declining precipitously, the committee knew that the collapse of the company was impending, and the committee members were conflict-

---

18. The primary individual Defendants at issue are the members of the Investment Committee, who were charged with the responsibility for managing the assets of the Savings Plan and determining if an independent investment manager needed to be appointed. The Savings Plan established the Investment Committee as the Named Fiduciary for these functions. The Court's discussion for the balance

of this Order will focus on the Amended Complaint's allegations against the members of the Investment Committee.

19. *Moench* involved a "pure" ESOP plan in which the employer and employees contributed to purchase only employer stock for the ESOP.

ed on account of their dual roles as Investment Committee members and directors. *Id.* at 572. The Court reasoned, that in such a situation, a fiduciary would realize that the objective of the plan (closer alignment of the interests of employer and employees) had failed and that the settlor of the trust would not expect continued adherence to the trust's directives. *Id.*

In *Kuper v. Iovenko,* 66 F.3d 1447 (6th Cir. Oct.4, 1995), the United States Court of Appeals for the Sixth Circuit applied *Moench* in affirming the trial court's finding (following a non-jury trial) that an investment committee member and the plan trustee had not abused their discretion in failing to liquidate and distribute the company stock held in an ESOP. The employer company had been acquired by another company. *Id.* at 1450. The acquisition document called for the employer stock in the ESOP to be transferred to the acquiring company's ESOP trust. *Id.* at 1451. During an eighteen month delay in the transfer, the employer's stock declined in value. *Id.* The Court held that the plain language of the plan (which prohibited diversification) violated ERISA, "as it constrained the [fiduciary's] ability to act in the best interest of the beneficiaries." *Id.* at 1457 (citing *Moench,* 62 F.3d 553). The Court held that "the Plan may not be interpreted to include a per se prohibition to diversify an ESOP." *Kuper,* 66 F.3d at 1457. Having done that, the Court went on to find that the fiduciary's decision to continue holding employer securities during the eighteen months was not an abuse of discretion because the employer's stock fluctuated significantly during the delay and several investment advisors had recommended holding the employer stock. *Id.* at 1459–60.

In *Steinman v. Hicks,* 352 F.3d 1101 (7th Cir. Dec.12, 2003), the Seventh Circuit affirmed the district court's grant of summary judgment to the trustees of an ESOP plan who had declined to diversify the plan's assets pending a trust-to-trust transfer. The facts of *Steinman* were similar to those of *Kuper,* discussed above. The district court's reasoning is not disclosed in the appellate opinion, but the Court of Appeals appeared to rest its holding on the fact that the employees had not been exposed to demonstrable additional risk stemming from the failure to diversify. Nonetheless, the Court commented in dicta:

> One can imagine a situation in which a trust-to-trust transfer, or the similar-seeming substitute at issue in this case, would trigger a duty of sale on the part of the trustees, even in the ESOP context where there is no duty to diversify *as such.* There is still a duty of prudence. 29 U.S.C. § 1104(a)(1)(B) [remaining citations omitted]. And in particular cases it might, as pointed out in *In re: Hemmeter,* 242 F.3d 1186, 1191 n. 2 (9th Cir.2001); *Kuper v. Iovenko, supra,* 66 F.3d at 1458, and *Moench v. Robertson, supra,* 62 F.3d at 568, become a duty to diversify, even though failure to diversify an ESOP's assets is not imprudence per se, 29 U.S.C. § 1104(a)(2), as that would bring in the duty to diversify by the back door.

*Steinman,* 352 F.3d at 1106.

On somewhat different facts, the United States Court of Appeals for the Ninth Circuit questioned *Moench*'s reasoning but found it unnecessary to decide whether it would adopt *Moench*'s holding. In *Wright v. Oregon Metallurgical Corp.,* 360 F.3d 1090 (9th Cir. Mar.11, 2004), the Court articulated a concern that *Moench* contravened Congress's intent expressed in ERISA. The plan at issue in *Wright* was described as a "stock bonus pension plan" which "mandated that a defined minimum percentage of each Plan participant's portfolio had to be invested in [em-

ployer] stock." *Wright,* 360 F.3d at 1093. Plaintiff Wright alleged that the fiduciaries of the plan should have allowed him to diversify out of company stock (i.e., sell the stock and substitute a different investment) when it was trading at a premium, despite the fact that such diversification would have been in violation of the plan's express terms. The Court noted that ERISA plainly provided that the duty to diversify and the duty of prudence to the extent it required diversification did not apply to fiduciaries of EIAPs. The court also criticized the Moench decision, stating that it "is difficult to reconcile with ERISA's statutory text." *Id.* at 1097. Ultimately, it declined to decide "whether the duty to diversify survives the statutory text of [29 U.S.C. § 1104(a) ]". *Id.* at 1097–98. The Court held that dismissal was warranted regardless of whether the *Moench* analysis was appropriate.

Finally, in *Lalonde v. Textron,* 369 F.3d 1 (1st Cir. May 7, 2004), the Court of Appeals reversed the district court's grant of defendant's motion to dismiss by "the Textron defendants" (Textron, Inc. and the Textron Savings Plan Committee). The district court recognized that the *Moench* presumption of reasonableness could be overcome "when a precipitous decline in the employer stock is combined with evidence that the company is on the brink of collapse or is undergoing serious mismanagement," *Lalonde v. Textron, Inc.,* 270 F.Supp.2d 272, 280 (D.R.I.2003), but found that these elements were not shown where the complaint had alleged only a drop in stock price, a decline in corporate profit, and a restructuring of the company during the class period. *Id.* In reversing the district court, the Court of Appeals expressed reluctance to affirm partly because the area of the law was "important and complex" and "neither mature nor uniform." *Lalonde,* 369 F.3d at 6. In addition, the Court noted that the district court had "failed to take account of

plaintiffs' allegation that, during the period identified in the complaint, Textron artificially inflated its stock price by concealing 'the disparate problems throughout Textron's segments and their adverse effect on Textron which are the subject of a federal securities lawsuit by shareholders against Textron and certain of its officers and directors.' " *Id.* (quoting the plaintiffs' complaint). The Court of Appeals noted that this allegation was not "terribly specific" but also noted that there was a pending separate lawsuit pertaining to these allegations, and therefore Textron had fair notice of plaintiffs' claims. *Id.* at 6–7. The Court did affirm the district court's grant of dismissal as to Putnam Fiduciary Trust Company, the plan's trustee, noting that nothing in the complaint showed that Putnam had "abused any discretion it might have had." *Id.* at 7.

The United States Court of Appeals for the Eleventh Circuit has not had an opportunity to express an opinion on whether the failure to diversify the holdings of an ESOP may give rise to liability, notwithstanding the language of 29 U.S.C. § 1104(a)(2). United States District Judge J. Owen Forrester in the Northern District of Georgia cited *Moench* but did not adopt or apply the abuse of discretion standard. *See Hill v. BellSouth Corp.,* 313 F.Supp.2d 1361, 1367 (N.D.Ga.2004).

In the absence of controlling authority, this Court concurs with the reasoning of *Wright* because it more faithfully adheres to Congress's intent as provided in ERISA. The Court agrees with *Wright*'s criticism of *Moench* as running afoul of ERISA's plain provisions. ERISA clearly states that in the case of EIAPs, "the diversification requirement ... and the prudence requirement (only to the extent that it requires diversification) ... is not violated by acquisition or holding of ... qualifying employer securities." 29 U.S.C.

§ 1104(a)(2). "It is well-established that when the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms." *Lamie v. United States Tr.*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (internal quotations omitted). Yet, *Moench*'s holding defies § 1104(a)(2), mandating diversification in certain circumstances even though ERISA plainly excuses it.

■ Having decided to strictly construe § 1104(a)(2), the Court agrees with Defendants that Count I fails to state a claim upon which relief can be granted; "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99.

■ Even if the Eleventh Circuit were to adopt *Moench*, this case is distinguishable on its facts (before the Third Amendment to the Trust Agreement was executed on July 27, 2004), because the Investment Committee did not have the right to prohibit investment in the Delta Common Stock Fund, nor did it have the right to fund the ESOP with anything other than Delta preferred or common stock. Further, while the Delta Common Stock Fund and the ESOP funds did have cash components, a fair reading of the Savings Plan and the Trust Agreement compels the conclusion that the cash (and cash-equivalent investments) were intended to fund expenses of the Trust and payments to participants, not to be a primary investment vehicle. Moreover, the setting of cash target ranges was required to be done by the Sponsor and the Trustee, not the Investment Committee. The instant case is stayed against the Sponsor (Delta) and the Trustee (Fidelity) is not a party.

■ In the instant case, having carefully reviewed the Savings Plan and the Trust Agreement attached to the Amended Complaint, the Court concludes that until the effective date of the Third Amendment to the Savings Plan (July 27, 2004), Am. Compl. Ex. L, the Investment Committee had no discretion to decide whether or not to use Delta securities in the ESOP or whether to offer the Delta Common Stock Fund in the choice-of-investment component.[20]

The plan in *Moench* was materially different from the Savings Plan in another respect as well. *Moench* involved a pure ESOP in which the employees' contributions purchased only employer securities. If the stock became worthless, the employees would lose their entire investment. In the instant case, the ESOP component of the Savings Plan was a stock bonus plan which supplemented the choice-of-investment component. As for the choice-of-investment component, the Delta Common Stock Fund was just one of many investments, and the Savings Plan mandated that the Fund could not account for more than 50% of the participant's account value. Thus, that component of the Savings Plan was diverse in any event. Adding more cash or cash-equivalents to the Delta Common Stock Fund would not have added any extra dimension to the offerings of the choice-of-investment component. Moreover, given the relative diversification of the Savings Plan as a whole, the case for diversification is not nearly as compelling as in *Moench*, in which 100% of the employees' investment was in employer

---

**20.** This is not to suggest that the Savings Plan could not have been amended by Delta (as the Savings Plan's sponsor) to discontinue or suspend the ESOP component or the offering of the Delta Common Stock Fund. The act of amending the plan, however, is not a fiduciary act, *Lockheed Corp. v. Spink*, 517 U.S. 882, 890, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996); therefore, failure to amend would not be a basis for fiduciary liability under ERISA.

stock. In the instant case, those who did not elect to invest in the Delta Common Stock Fund would have one-third or less of their initial investments in Delta shares. An abuse of discretion for failing to diversify is not shown by these facts.[21]

Assuming, arguendo, that the Court of Appeals decides to adopt *Moench,* Count I still should be dismissed for another reason. Defendants do not deny that, as in *Moench,* Delta's stock suffered a serious decline in value during the Class Period. Defendants insist, however, that such a decline, without more, is insufficient to survive a motion to dismiss. Defendants claim that in addition to a precipitous stock decline, *Moench* requires that the fiduciaries have knowledge of impending collapse or, as other courts have held, have knowledge of some other impropriety, such as misrepresentation, fraud, or accounting irregularities.

■ The Court agrees. A mere decline in stock value, absent knowledge of impending collapse or some other impropriety, is insufficient under *Moench* and cases interpreting it. Plaintiff cited cases for the proposition that impending collapse was not a prerequisite. However, all of these cases involved one of the other improprieties. *See, e.g., In re: Sprint Corp. ERISA Litig.,* 388 F.Supp.2d 1207, 1223–24 (D.Kan.2004) (involving misrepresentation and a companion securities fraud class action resulting in $50 million settlement); *Hill v. BellSouth Corp.,* 313 F.Supp.2d 1361, 1368 (N.D.Ga.2004) (involving ac-

counting irregularities and corporate misstatement of earnings); *In re: Sears, Roebuck & Co. ERISA Litig.,* 2004 WL 407007, *2–3, 2004 U.S. Dist. LEXIS 3241, *7–9 (N.D.Ill.2004) (misrepresentation in SEC filings that Sears' credit card uncollectible accounts method adequately allowed for losses). Thus, in order to allege abuse of discretion, Plaintiff must allege either (1) knowledge of impending collapse or (2) some other impropriety.

■ The Court begins with the category of "other impropriety." Defendants correctly point out that the only paragraphs in Plaintiff's Amended Complaint which even approach such an allegation are as follows:

185. By not disclosing negative material information.

\*    \*    \*    \*    \*    \*

188. SEC filings and related Company statements and releases issued during the Class Period were inaccurate, incomplete and materially misleading.

\*    \*    \*    \*    \*    \*

230. Public misrepresentations and inflated forecasts [and] consequent artificial inflation of the value of Delta stock.

Am. Compl. ¶¶ 185, 188, & 230. Defendants argue that such conclusory statements without any factual support do not suffice to avoid dismissal.

■ The Court agrees. Although the Court is to view the facts in the light most favorable to Plaintiff and accept all well-

---

**21.** Plaintiff claims that the *Moench* presumption is an "evidentiary presumption that has no place being invoked at the motion to dismiss phase, where no discovery has been conducted and where plaintiffs' well-pleaded allegations must be taken as true." Pl.'s Resp. Br. 10. In this case, the Court does take Plaintiff's well-pleaded allegations as true and looks only to see if they support Plaintiff's claim that the presumption can be overcome. *See In re: Polaroid ERISA Litig.,* 362

F.Supp.2d 461, 475 (S.D.N.Y.2005) (acknowledging that "the presumption of prudence is an evidentiary determination that is ill-suited to resolution on a motion to dismiss," but stating "[n]onetheless, this Court must ensure that Plaintiffs have sufficiently alleged facts entitling them to present evidence in support of their claims"). Clearly, Plaintiff's Amended Complaint is built around the theory of *Moench* and Plaintiff has set forth contentions calculated to meet *Moench* 's standards.

pleaded averments as true, Plaintiff does not have license to assert unsupported conclusions to avoid dismissal. *See, e.g., Aldana v. Del Monte Fresh Produce, N.A., Inc.,* 416 F.3d 1242, 1248 (11th Cir. 2005) ("Bald assertions will not overcome a Rule 12(b)(6) motion. Likewise, unwarranted deductions of fact are not admitted as true in a motion to dismiss.") (internal citations and quotations omitted); *Oxford Asset Mgmt. v. Jaharis,* 297 F.3d 1182, 1188 (11th Cir.2002) ("[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal."). Therefore, the Court need not accept as true Plaintiff's reference to nondisclosure of unspecified "negative material information," "public misrepresentations," and "inaccurate" and "incomplete" SEC filings, especially in light of the fact that Plaintiff's Amended Complaint is replete with statements and public announcements issued by Delta disclosing Delta's financial difficulties. Such allegations do not suffice to establish the impropriety necessary to establish abuse of discretion under *Moench.* Nor is it the case (as it was in *Lalonde* ) that Delta and the individual Defendants are facing a parallel federal securities lawsuit that would give Defendants "fair notice of what [Plaintiff's] claim is and the grounds upon which it rests." *Lalonde,* 369 F.3d at 6–7 (internal quotations omitted).[22]

▮▮▮ The Court now turns to the issue of impending collapse. "Impending" is the operative word. Impending means "that [which] is about to occur; imminent." *Webster's Third Int'l Dictionary* 1132. The relevant event of "collapse" in this case is Delta's bankruptcy. Thus, the issue is whether bankruptcy was imminent at any time during the Class Period.

Plaintiff's Amended Complaint does not directly assert impending collapse, nor does it contain allegations sufficient to establish impending collapse. Plaintiff defined the Class Period as running through September 30, 2004. Not coincidentally, September 2004 is the approximate time frame that Delta appointed U.S. Trust to be the independent fiduciary for the Savings Plan. Delta did not file bankruptcy until one year later on September 14, 2005. The fact that Delta operated for an additional year after the end of the Class Period indicates that collapse was not impending by definition.

Plaintiff's Amended Complaint points to the fact that Defendants granted thirty-five key executives (including, presumably, some of the Defendants) bankruptcy-proof pensions in an attempt to show that they had knowledge of impending collapse. These pensions, however, came into existence in January 2002—three years before filing bankruptcy. This is simply too far removed in time to constitute knowledge of impending collapse.

Plaintiff also included in the Amended Complaint statements made in the fall of 2004 by Delta directors which Plaintiff claims establish knowledge of impending collapse. These statements include "Delta has been headed to bankruptcy since day one" and "everyone realized that while this cash infusion from borrowing would enable Delta to continue on without severe financial problems, the business would have to turn around or Delta would have a problem paying all this money." Am. Compl. ¶¶ 105–106. These were conclusory, spec-

---

**22.** Plaintiff's failure to plead specific facts supporting the allegations of misrepresentation and failure to disclose are particularly striking given the unusual verbosity of Plaintiff's 258–paragraph, ninety-seven-page Amended Complaint. The Court does not believe that Plaintiff's failure to include the needed factual detail was the result of oversight.

ulative comments that do not supply the type of objective, well-pleaded averments required to avoid dismissal.

Once the Investment Committee's powers were augmented by the Savings Plan amendment on July 27, 2004, it had the power to take the actions which ultimately were taken by U.S. Trust upon its designation as independent investment advisor. The Court has considered that between July 27 and the date U.S. Trust acted to provide some relief to participants (but not after September 30, 2004), the Investment Committee had the necessary discretion to take the action U.S. Trust ultimately took. However, it is obvious that the Investment Committee acted with reasonable dispatch in appointing U.S. Trust on or about August 4, 2004, *see* Am. Compl. Ex. E, and that U.S. Trust took action by September 30, 2004, *see* Am. Compl. Ex. O. This, in the Court's opinion, suffices to show that both the Investment Committee and its delegee, U.S. Trust, acted promptly to address concerns as to the declining value of Delta stock.

For all of the foregoing reasons, Plaintiff's Amended Complaint, including attachments, does not adequately allege that Defendants failed to prudently and loyally manage plan assets. The Court grants Defendants' motion to dismiss with respect to Count I except as to Delta.

### IV. *Count II: Failure to Monitor & Inform Defendants*

Count II alleges that Defendants[23] failed to give information to and review the actions of the Committee Defendants. Defendants' Motion to Dismiss Count II is premised on the Court's dismissal of the prudence claim in Count I. Defendants state "there can be no claim for breach of the duty to monitor the performance of or to provide information to fiduciaries whom Plaintiff did not properly allege to have acted imprudently." Defs.' Mot. Dismiss 28.

The Court agrees with Defendants. First, Plaintiff cannot maintain a claim of failure to monitor when those to be monitored were acting prudently. The Court also notes that with respect to the failure to inform component of Count II, the allegations in the Amended Complaint do not amount to a failure to disclose material information. As stated in Part II.C of the Discussion section of this Order, the Court will not accept as true Plaintiff's bald allegations of nondisclosure of material information, public misrepresentations, and inaccurate and incomplete SEC filings. *Aldana*, 416 F.3d at 1248; *Oxford Asset Mgmt.*, 297 F.3d at 1188.

Thus, Defendants' Motion to Dismiss with respect to Count II is granted except as to Delta.

### V. *Count III: Failure to Inform Savings Plan Participants*

█ Plaintiff claims that Defendants' failure to disclose material information hampered his ability to make informed investment decisions regarding Delta securities. The well-pleaded allegations in Plaintiff's Amended Complaint do not establish misrepresentation, fraud, or any other action that would amount to a failure to inform Savings Plan participants. To the contrary, the Amended Complaint contained numerous instances of press releases and articles detailing Delta's financial condition. Delta even made some of these statements available specifically to employees via Delta's website. *See* Am. Compl. ¶ 149. Such public statements belie Plaintiff's allegations of misrepresentation and nondisclosure.

---

**23.** Because this case is stayed as against Delta, the Court does not consider Plaintiff's fail- ure to monitor and inform claim against Delta as the Savings Plan's sponsor.

Defendants' Motion to Dismiss is granted with respect to Count III except as to Delta.

### VI. *Count IV: Breach of the Duty of Loyalty*

 Plaintiff alleges, inter alia, that Defendants breached their duty of loyalty by "failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investment in the Delta securities." Am. Compl. ¶ 240. As discussed above, however, the Court has concluded that the Investment Committee acted prudently and within a reasonable amount of time in appointing U.S. Trust. In fact, within eight days of the amendment to the Savings Plan giving the Investment Committee the authority to limitations or restriction on the Savings Plan's investment in Delta securities in the Delta Common Stock Fund and the ESOP Fund, Exhibit E to Plaintiff's Amended Complaint shows that U.S. Trust had been appointed. As a matter of law, this does not amount to a failure "to timely engage independent fiduciaries." Am. Compl. ¶ 240. Therefore, Defendants' Motion to Dismiss is granted with respect to Count IV except as to Delta.

### VII. *Defendants' Request for Oral Argument*

Defendants requested an opportunity for oral argument on the Motion to Dismiss. However, the Court has decided Defendants' Motion to Dismiss on the grounds stated above; therefore, the Request for Oral Argument [# 50] is DISMISSED.

### CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss [# 44] is hereby GRANTED as to all counts against all Defendants except Delta. The Motion to Dismiss [# 44] is DENIED as to Delta because of the bankruptcy stay. The Court has not considered the merits of Defendants' Motion to Dismiss insofar as it is brought on behalf of Delta. Defendants' Request for Oral Argument [# 50] is DISMISSED.